## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOSE RUIZ & LOURDES RUIZ,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:13-cv-02244-MHH** |
| | } | |
| **WINTZELL'S HUNTSVILLE,** | } | |
| **L.L.C. A/K/A WINTZELL'S** | } | |
| **OYSTER HOUSE, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

Plaintiff Jose Ruiz developed a severe infection after eating raw oysters at Wintzell's Oyster House, a restaurant owned and operated by Wintzell's Huntsville, LLC.  Mr. Ruiz asserts claims for violation of the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), breach of warranty, and negligence against Wintzell's Huntsville, LLC; franchisor Wintzell's Franchise Company, Inc.; oyster supplier Webb's Seafood, Inc. (WSI); and Price Foods, Inc., a company that Mr. Ruiz alleges provided management services to Wintzell's.  (Doc. 118).  Mr. Ruiz's wife, Lourdes Ruiz, asserts a claim against the defendants for

loss of consortium. (Doc. 118).[1]  Pursuant to Federal Rule of Civil Procedure 56, the defendants ask the Court to enter judgment in their favor on the plaintiffs' claims. (Docs. 137, 140, 142).  For the reasons stated below, the Court grants the defendants' motions for summary judgment in part and denies the motions in part.

## I.     SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).  When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable

---

[1]  In their fourth amended complaint, Mr. and Mrs. Ruiz named as defendants Wintzell's Huntsville, LLC; Wintzell's Franchise Company, Inc.; Webb's Seafood, Inc.; Price Foods, Inc.; Miller Seafood, Inc.; and Misho's Oyster Company. (Doc. 118).  The Court previously dismissed the plaintiffs' claims against Miller Seafood, Inc. and Misho's Oyster Company. (Docs. 129, 160).

inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

## II.  FACTUAL BACKGROUND

On December 14, 2012 and December 15, 2012, Mr. Ruiz ate raw oysters at Wintzell's Oyster House in Huntsville, Alabama.  (Doc. 150, p. 2; Doc. 150-7, p. 3; Doc. 166, p. 11).  On December 16, 2012, Mr. Ruiz began experiencing nausea and diarrhea, and he had a fever.  (Doc. 150, p. 2; Doc. 166, pp. 13–14).  A few days later, Mr. Ruiz visited the emergency room because he was experiencing pain, discoloration, and swelling in his left leg.  (Doc. 166, p. 16).  Doctors suspected that Mr. Ruiz had a blood clot in his leg.  An ultrasound provided no evidence to confirm the doctor's suspicions, so the doctors sent Mr. Ruiz home.  (Doc. 166, p. 16). Early the next morning, when Mr. Ruiz "just could not take the pain anymore," he returned to the emergency room.  (Doc. 166, p. 16).

Mr. Ruiz does not remember the events that took place after he arrived at the hospital because he "was in so much pain and [his doctors] gave [him] so much morphine."  (Doc. 166, p. 17).  When Mr. Ruiz woke up, doctors informed him that he had been infected with *Vibrio vulnificus* bacteria, a type of bacteria commonly found in raw oysters.  (Doc. 150, p. 2; Doc. 142, p. 2; Doc. 166, p. 17). Mr. Ruiz's doctors also told him that he was positive for Hepatitis C, a virus that causes liver disease.  (Doc. 150, p. 2); *see Hepatitis C FAQs for the Public*,

CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/hepatitis/hcv/cfaq/htm (last visited August 4, 2017). When Mr. Ruiz ate oysters at Wintzell's, he did not know that he was positive for Hepatitis C; he was "under the impression that [he] was very healthy." (Doc. 150, p. 2; Doc. 166, p. 17).

*Vibrio vulnificus* infections generally cause no more than mild to moderate gastrointestinal symptoms, but individuals with compromised livers may experience more severe effects. *See Vibrio vulnificus Infections Associated with Eating Raw Oysters – Los Angeles, 1996*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/mmwr/preview/mmwrhtml/00043142.htm (last visited August 7, 2017). As a result of his liver disease, Mr. Ruiz suffered a severe *vibrio* infection, and doctors ultimately had to amputate his left leg to prevent the infection from spreading. (Doc. 150, pp. 2–3; Doc. 166, p. 17). According to Mr. Ruiz, it is a "miracle" that he is alive. (Doc. 166, p. 17).

The parties acknowledge that Mr. Ruiz's injuries stem from his consumption of raw oysters at Wintzell's, but the defendants contend that they are not liable for Mr. Ruiz's injuries. For its part, oyster supplier WSI argues that it may not be held liable for Mr. Ruiz's injuries because Mr. Ruiz cannot prove that WSI supplied the oysters that he consumed at Wintzell's on December 14 and 15. In the days leading up to Mr. Ruiz's dinner at Wintzell's, the restaurant received oysters from

WSI and from a second source, Bon Secour Fisheries. On December 10, 2012, Wintzell's received 2,500 oysters from WSI and 1,000 oysters from Bon Secour Fisheries, Inc. (Doc. 137, p. 2; Doc. 150, pp. 7–8, 24). On December 13, 2012, Wintzell's received another 2,500 oysters from WSI. (Doc. 150, p. 8). [2]

According to Wintzell's kitchen manager Charles Polk, when Wintzell's receives oyster deliveries, the driver of the delivery truck carries the boxes of oysters to Wintzell's main cooler. (Doc. 164, p. 54). The oysters remain in the cooler until they are ready to be shucked. (*See* Doc. 164, p. 58). Each box of oysters that Wintzell's receives has a harvest date and a use-by date. (Doc. 164, p. 47). To ensure that oysters with older harvest dates are used before oysters with more recent harvest dates, Wintzell's applies "use-first" stickers to the boxes with the older harvest dates. (Doc. 164, p. 95). The kitchen staff is trained to use boxes with use-first stickers on them before using boxes without use-first stickers. (*See* Doc. 164, pp. 95, 151). Mr. Polk testified that he was responsible for placing the use-first stickers on the boxes of oysters. (Doc. 164, p. 95). According to Mr. Polk, "[i]f a truck came in and we had boxes [of oysters] already there, the first

---

[2] WSI did not sell the oysters directly to Wintzell's. WSI sold the oysters to Sysco Gulf Coast, Inc., and Sysco sold the oysters to Wintzell's. (Doc. 137, pp. 2, 4 n. 2; *see* Doc. 164, pp. 40–41). WSI does not dispute that it supplied the oysters that Sysco delivered to Wintzell's on December 10 and December 13, 2012. (*See* Doc. 137, p. 2). The Court dismissed the plaintiffs' claims against Sysco and Bon Secour. (Docs. 92, 100). The plaintiffs did not name either company as a defendant in their fourth amended complaint. (Doc. 118).

thing that'll be done, use first would be on there before the new order came in." (Doc. 164, p. 96).

During a typical dinner service at Wintzell's, the oyster shucker arrives at the restaurant around 1:00 p.m. (Doc. 164, p. 65). The shucker removes a box of oysters from the cooler and brings the box to the shucking station outside the kitchen. (Doc. 164, pp. 58–59).[3] The oysters are kept on ice at the shucking station. (Doc. 164, pp. 63–64). When the shucker has shucked 24 oysters, the shucker places the oysters on a cooled metal tray, wraps the tray in plastic, marks the date, and moves the oysters to the cooler, where the oysters remain until a customer orders them. (Doc. 164, pp. 63–64).

Mr. Polk does not know whether the oysters that Mr. Ruiz consumed on December 14, 2012 and December 15, 2012 came from Bon Secour or WSI. (Doc. 164, pp. 101–02). Although he is "pretty sure" based on "good training" that Wintzell's kitchen staff followed the use-first protocol in the days leading up to Mr. Ruiz's dinner on December 15, Mr. Polk stated that he has no personal knowledge of whether the staff in fact used boxes marked "use first" before using boxes with more recent harvest dates. (*See* Doc. 164, pp. 150–54). Mr. Polk testified that it is possible, though unlikely, that the oysters that Bon Secour

---

[3] According to Mr. Polk, sometimes the shucker will not have to retrieve the oysters from the cooler because Mr. Polk already will have put the oysters on ice at the shucking station in preparation for dinner service. (Doc. 164, pp. 63-64).

delivered on December 10, 2012 still were in inventory on December 14, 2012 or December 15, 2012. (*See* Doc. 164, pp. 150–54).

Dr. Gary Rodrick, Mr. Ruiz's expert, has opined that it is extremely unlikely that Bon Secour oysters still were in Wintzell's inventory on December 15. Dr. Rodrick opines that WSI supplied the oysters that Mr. Ruiz consumed. (Doc. 150-4).[4] In addition, Dr. Rodrick opines that the oysters contained an unreasonably dangerous level of *Vibrio vulnificus*, that WSI contributed to the unreasonably dangerous level of *Vibrio vulnificus* in the oysters, and that Wintzell's was negligent in purchasing oysters from WSI. (Doc. 145, pp. 1–2; Doc. 150-4, pp. 4–5, 7). The Wintzell's defendants and WSI have filed motions to strike Dr. Rodrick's testimony. (Docs. 138, 139).

Mr. Ruiz also offers the expert opinion of public health sanitarian Roy Costa. (Doc. 150-5).[5] Mr. Costa opines that Wintzell's committed health code violations by failing to properly store and serve its raw oysters, which caused the *vibrio* bacteria in the oysters to multiply to unsafe levels. (Doc. 150-5, p. 4). Mr. Costa also is of the opinion that both Wintzell's Huntsville and Wintzell's

---

[4] Dr. Gary Rodrick is an Emeritus Professor at the University of Florida in the Department of Food Science and Human Nutrition. (Doc. 150-4, p. 1). Dr. Rodrick holds degrees in Biology and Zoology. (Doc. 150-4, p. 1). Dr. Rodrick's research focuses on *Vibrio vulnificus* in oysters. (Doc. 150-4, p. 1).

[5] Roy Costa is a registered public health sanitarian and consultant with a specialty in food safety. (Doc. 150-5, pp. 6-7). He holds a B.S. in biological sciences and an M.S. in health services management. (Doc. 150-5, p. 6). He formerly was employed by the State of Florida in various regulatory and educational capacities relating to public health. (Doc. 150-5, p. 7).

Franchise Company were negligent in their selection of oyster suppliers, and that both entities are responsible for failing to introduce adequate employee training and procedures for handling raw oysters. (Doc. 150-5, p. 4). Wintzell's has filed a motion to strike Mr. Costa's testimony. (Doc. 139).

Wintzell's Huntsville, LLC is a franchisee of Wintzell's Franchise Company, Inc. (Doc. 163, pp. 26–29). Dana Price, operating member and 50% owner of Wintzell's Huntsville, LLC, testified that Wintzell's Franchise Company provided him "with operational procedures, systems, [and] menus. . . ." (Doc. 163, p. 29). According to Mr. Price, the restaurant's general manager was responsible for employee training, while Wintzell's Franchise Company provided training materials. (Doc. 163, pp. 31-32). Additionally, Wintzell's Franchise Company provided its franchisees with the menu warnings alerting customers to the dangers of eating raw meat and seafood. (Doc. 163, p. 35). [6]

Mr. Price employed Alan Renfroe in a managerial capacity at several of his restaurant locations including his Wintzell's Oyster House in Huntsville. (Doc 163, pp. 18-19, 24, 62). At Wintzell's Huntsville, Mr. Renfroe worked as the director of operations. He was responsible for overseeing matters relating to guest satisfaction and "proper [restaurant] procedures," although he spent only limited

---

[6] Dana Price also is the president and sole shareholder of Price Foods, Inc. (Doc. 163, pp. 12–13). Price Foods, Inc. owns several restaurants in Alabama. (Doc. 163, pp. 12–19).

time at Wintzell's Huntsville during any given week.  (Doc. 163, p. 61; Doc. 150-13, p. 9).

This broad overview of the facts provides a backdrop for the Court's analysis of the defendants' motions.  Additional facts relevant to those motions are discussed below.

## III.  DISCUSSION

### A. WSI's Motion for Summary Judgment

#### 1.  **WSI's supply chain defense**

WSI argues that the Court should enter judgment in the company's favor on Mr. Ruiz's AEMLD, negligence, and breach of warranty claims because Mr. Ruiz cannot establish that WSI supplied the oysters that he consumed.  WSI contends that the evidence is insufficient to enable jurors to find with mathematical certainty that the oysters that made Mr. Ruiz sick came from WSI rather than Wintzell's other supplier, Bon Secour.  (Doc. 137, p. 2).  WSI's argument fails because at the summary judgment stage, mathematical certainty is not the standard of evidentiary proof.

"The burden of proof is a substantive issue and is therefore controlled by state law in diversity cases."  *Wynfield Inns v. Edward LeRoux Grp., Inc.*, 896 F.2d 483, 491 (11th Cir. 1990).  "In all civil actions brought in any court of the State of Alabama, proof by substantial evidence shall be required to submit an issue of fact

to the trier of the facts." Ala. Code 1975 § 12-21-12. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *West v. Founders Life Assurance Co. of Fla.,* 547 So. 2d 870, 871 (Ala. 1989). Evidence can permit the inference that a fact exists even though it does not establish that fact's existence to a mathematical certainty. Where a plaintiff's evidence permits a reasonable juror to infer that a material fact exists, then the Court should deny a defendant's motion for summary judgment. *See* FED. R. CIV. P. 56(a).

It is true, of course, that a jury's verdict may not be based on speculation. *See Ex Parte Harold L. Martin Distrib. Co., Inc.*, 769 So. 2d 313, 315 (Ala. 2000). The evidence concerning the source of the oysters that Mr. Ruiz consumed is sufficiently probative to enable jurors to reasonably infer that WSI supplied the oysters than made Mr. Ruiz ill. That evidence begins with raw numbers: between December 10 and December 14, Wintzell's oyster inventory consisted of 1,000 oysters from Bon Secour and 5,000 oysters from WSI. (Doc. 164, p. 82; Doc. 164-3, pp. 12-13). Thus, 80% of the oysters in Wintzell's inventory were WSI oysters.

Evidence concerning the timing of oyster deliveries and Wintzell's oyster usage policies also is important. Bon Secour delivered its 1,000 oysters to Wintzell's on December 10, 2012; Sysco delivered approximately 2,500 WSI

oysters on the same date. On December 13, 2012, Sysco delivered another 25 boxes containing approximately 2,500 WSI oysters. (Doc. 164-3, p. 13).[7] Viewed in the light most favorable to Mr. Ruiz, the record contains evidence that Wintzell's staff routinely placed "use first" stickers on boxes of raw oysters already in inventory when another shipment arrived and that Wintzell's had a policy of shucking boxes so marked before boxes delivered later. (Doc. 136, pp. 40-42). As mentioned, based on Wintzell's "use first" policy, Wintzell's kitchen manager testified that it is unlikely that Bon Secour oysters remained in Wintzell's inventory on December 14 and 15. (Doc. 164, pp. 150-54). From all of this evidence jurors could reasonably infer that Wintzell's employees shucked and served the oysters that Bon Secour delivered on December 10 before Mr. Ruiz ate at the restaurant on December 15. That leaves only WSI oysters for Mr. Ruiz's consumption.

WSI argues that the amount of oysters in Wintzell's inventory on December 10, 2012 cannot be exactly quantified. (Doc. 137, p. 18). WSI also argues that Mr. Ruiz cannot prove definitively that Wintzell's employees followed the prescribed first-in, first-out procedure for raw oysters during the week in question. (Doc. 137,

---

[7] The only other December deliveries to which the parties point occurred on December 3 and December 6, 2012. Both appear to be WSI oysters delivered by Sysco, and they consisted of 2,000 oysters and 2,500 oysters respectively. (Doc. 164-3, pp. 10-11). Because both parties agree that oysters have a fourteen day shelf life from the time of harvest, the Court need not examine more remote deliveries. (Doc. 137, p. 5; Doc. 150, p. 48).

pp. 8-9).  These objections are jury arguments about the weight of the evidence. At summary judgment the Court must draw reasonable inferences from the evidence in favor of Mr. Ruiz, and the raw numbers combined with the undisputed delivery dates and Wintzell's "use-first" policy produce reasonable inferences sufficient to create a jury question.

In addition to shipping records and Wintzell's internal policies, the plaintiffs rely on Dr. Rodrick's expert opinion that the oysters which Mr. Ruiz consumed on December 15 came from WSI.  (Doc. 150-4, p. 4).  To develop his opinion, Dr. Rodrick evaluated the harvest date tags from Wintzell's December 2012 oyster inventory and Wintzell's sales records and determined, based on his experience in the industry, that WSI supplied the oysters that made Mr. Ruiz sick.  (Doc. 150-4, p. 4).

WSI challenges Dr. Rodrick's competence to give testimony regarding the origin or supply chain from which Wintzell's received the oysters consumed by Mr. Ruiz.  (Doc. 138, p. 2).  WSI asserts that Dr. Rodrick has no education or training qualifying him to render opinions on the subject of oyster origination. (Doc. 138, p. 2).  WSI also argues that Dr. Rodrick's methods are not sufficiently reliable to pass muster under the *Daubert* standard.  (Doc. 138, p. 6).

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals* assigned a gatekeeping role to the district court with respect to the admissibility of scientific expert testimony. 508 U.S. 579, 597 (1993). "The district judge has 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (quoting *Daubert*, 509 U.S. at 597). The Supreme Court later extended this gatekeeping role to cover admissibility determinations for all types of expert testimony including technical testimony based on "knowledge and experience of [the relevant] discipline." *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). Exercising its gatekeeping role, the Court finds that Dr. Rodrick is qualified to offer an opinion about the source of the allegedly contaminated oysters, and his opinion is relevant and rests on a reliable foundation.

Dr. Rodrick is a biologist who focuses his research on food safety and seafood microbiology. (Doc. 138-1, pp. 1, 8). His CV indicates that he has received numerous grants to study pathogens in commercially important shellfish. (Doc. 138, p. 9). His publications include a script for an informational program on safety in purchasing and distributing shellfish as well as several abstracts on hazard analysis and critical control points (HACCP) assessments for shellfish distributors. (Doc. 138, pp. 12, 23-24). Dr. Rodrick teaches several courses devoted to the issue

of food safety, and the discipline entails exploration of seafood distribution chains. (Doc. 145-1, p. 2). While the study of distribution chains may not be scientific in a technical sense, it is an area in which someone may gain expertise through personal knowledge and experience. Based on his background, the Court finds that Dr. Rodrick has sufficient experience with food safety and distribution, particularly with respect to shellfish, to give testimony on the source of the oysters that Wintzell's served on December 14 and 15, 2012.

In response to WSI's objection that Dr. Rodrick's methodology is not sufficiently reliable, the Court notes that government regulations seem to contemplate precisely the exercise that Dr. Rodrick used to trace the oysters in this case. Regulations mandate that the tags accompanying all oyster shipments must identify the date and location of the harvest, the identity of the harvester, and the identity of any packer or repacker. 21 C.F.R. § 1240.60(b), (c). Section 123.28 mandates that recipients of these shipments maintain records of the information required for the oyster tags. 21 C.F.R. § 123.28(c), (d).

An analysis of the harvest tags in conjunction with Wintzell's sales records and WSI's business records is something that Dr. Rodrick is capable of performing as a task incident to his work in food safety. Given the evidence recited above, there does not appear to be "too great an analytical gap between the data and the opinion proffered." *Chapman*, 766 F.3d at 1306–07 (internal quotations omitted).

14

Thus, the Court finds that Dr. Rodrick has used a sufficiently reliable method applied to a sufficient body of evidence to offer an opinion about the oysters' origins. The Court, therefore, denies WSI's motion to strike Dr. Rodrick's testimony.

WSI argues that with or without Dr. Rodrick's opinions, the plaintiffs' supply chain evidence is not sufficient to create a question of fact under the *Azalea Box* standard. *Turner v. Azalea Box Co.*, 508 So. 2d 253 (Ala. 1987).[8] The Court finds that the facts of *Azalea Box* are distinguishable from the facts in this case, so *Azalea Box* does not warrant summary judgment for WSI.

In *Azalea Box*, the origin of an allegedly defective wooden shipping pallet was unclear. The Coca-Cola distributor where the plaintiff worked received pallets from two suppliers, one of which was Azalea Box Company. *Azalea Box*, 508 So. 2d at 253–54. The distributor also traded pallets with other distributors and repaired some of the pallets in the warehouse. *Azalea Box*, 508 So. 2d at 254. The parties agreed that the pallets were not distinctive in a way that would allow the pallets to be traced to one source or another. *Azalea Box*, 508 So. 2d at 254. The Court reviewed the four possible sources of the pallet that caused the plaintiff's injuries and concluded that:

---

[8] At oral argument, counsel for WSI referred to this decision as the *Azalea Box* decision. The Court uses WSI's short-form reference in this opinion.

> two things can be equally inferred: (1) Azalea Box manufactured and sold the subject pallet to Coca-Cola, or (2) Azalea Box did not manufacture and sell the subject pallet to Coca-Cola. Accordingly, to use this evidence to support Turner's contention that Azalea Box supplied the pallet in question to the exclusion of other sources is to engage in speculation and conjecture.

*Azalea Box*, 508 So. 2d at 254. Consequently, the Alabama Supreme Court affirmed summary judgment for Azalea Box on Turner's AEMLD claim, noting that "[w]hen evidence points equally to inferences that are favorable and to inferences that are unfavorable to the moving party, the evidence lacks probative value; and the evidence may not be used to support one inference over another because such use is mere conjecture and speculation." *Azalea Box*, 508 So. 2d at 254.

Central to the Alabama Supreme Court's holding in *Azalea Box* was its determination that the evidence equally supported two conflicting inferences. The facts presented here are unlike *Azalea Box* because, although the evidence can support more than one inference, the support for each inference is not equal. WSI notes that its oysters and those from Bon Secour are physically indistinguishable. (Doc. 137, p. 8). That may be true, but the factual analogies to *Azalea Box* end there. Unlike the pallets in *Azalea Box*, the oysters at issue here have only two possible sources: WSI or Bon Secour. (Doc. 137, pp. 7-8). The question is whether the plaintiffs' evidence indicates that the oysters which Wintzell's served

on December 14 or 15 are more likely to have come from WSI than from Bon Secour. As discussed, the weight of the evidence, viewed most favorably to the plaintiffs, points to WSI as the source of the contaminated oysters.

Only where the evidence "is without selective application" to a particular inference is an inference drawn from the evidence reduced to impermissible conjecture. *Vesta Fire Ins. Corp. v. Milam & Co. Constr.*, 901 So. 2d 84, 101 (Ala. 2004) (internal quotations omitted). This description simply does not fit the plaintiffs' evidentiary showing concerning the source of the oysters that Mr. Ruiz consumed. A jury will have to decide whether WSI supplied the oysters.

### 2. Alabama's Innocent Seller Statute

Alternatively, WSI argues that Alabama's Innocent Seller Statute provides blanket immunity against all of the plaintiffs' claims. The Court disagrees.

The Innocent Seller Statute states, in relevant part:

(b) No product liability action may be asserted or may be provided a claim for relief against any distributor, wholesaler, dealer, retailer, or seller of a product, or against an individual or business entity using a product in the production or delivery of its products or services (collectively referred to as the distributor) unless any of the following apply:

(1) The distributor is also the manufacturer or assembler of the final product and such act is causally related to the product's defective condition.

(2) The distributor exercised substantial control over the design, testing, manufacture, packaging, or labeling of the product and such act is causally related to the product's condition.

(3) The distributor altered or modified the product, and the alteration or modification was a substantial factor in causing the harm for which recovery of damages is sought.

(4) It is the intent of this subsection to protect distributors who are merely conduits of a product. This subsection is not intended to protect distributors from independent acts unrelated to the product design or manufacture, such as independent acts of negligence, wantonness, warranty violations, or fraud.

Ala. Code 1975 § 6-5-521.

WSI begins its argument by noting, correctly, that the term "products liability" is broad enough to encompass all of the plaintiffs' claims for relief. (Doc. 137, p. 19). WSI continues by explaining that it "did not manufacture or assemble the oysters . . . WSI did not exercise any substantial control over the design, testing, manufacture, packaging, or labeling of the oysters . . . WSI did not alter or modify the oyster product that was consumed by Mr. Ruiz." (Doc. 137, pp. 13–14). Based on these assertions, WSI concludes that it is a "mere conduit" of the oysters, so that the company is entitled to the statute's protection. (Doc. 137, p. 24).

That the product in question is raw oysters makes the statute's application less straightforward.

A 'product liability action' means any action brought by a natural person for personal injury, death, or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, or labeling of a *manufactured product* when such action is based upon (1) negligence, (2) innocent or negligent misrepresentation, (3) the manufacturer's liability doctrine, (4) the Alabama extended manufacturer's liability doctrine as it exists or is hereafter construed or modified, (5) breach of any implied warranty, or (6) breach of any oral express warranty and no other. A product liability action does not include an action for contribution or indemnity.

Ala. Code § 6-5-521(a) (emphasis added). As found in nature, an oyster is not a manufactured product. The question is whether an oyster becomes a manufactured product when it is harvested and packaged for sale. The plaintiffs contend that WSI "processes" raw oysters by removing them from their original packaging, placing them on a conveyor belt, washing the oysters with a high power spray, repacking the oysters, and labeling them for sale. (Doc. 150, p. 46).

Assuming without deciding that raw oysters are manufactured products for purposes of the innocent seller statute, the Court finds as a matter of law that WSI does not qualify as a mere distributor or conduit. This conclusion is based both on the foregoing description of WSI's activities preparing the oysters for retail and from WSI's own citation to 21 C.F.R. § 123.28. (Doc. 156, p. 7). [9] This regulation promulgated by the Food and Drug Administration is directed at processors of

---

[9] 21 C.F.R. § 123.3(k)(1) defines processing as "[h]andling, storing, preparing, heading, eviscerating, shucking, freezing, changing into different market forms, manufacturing, preserving, packing, labeling, dockside unloading, or holding."

molluscan shellfish. WSI acknowledges that this section of the regulation governs its conduct, and this lends weight to the conclusion that WSI does more than simply distribute a raw product; WSI processes harvested oysters to ready them for retail sale.

The purpose of Alabama's innocent seller statute, as described in subsection (b)(4), is to protect distributors who are mere conduits of a product, presumably because they are not positioned to inspect for product defects already extant when the products come into the distributor's possession. Ala. Code § 6-5-521(b)(4). By bringing oysters from sea to table, WSI occupies a position well-suited to limiting the number of dangerous products reaching end-consumers, a fact reflected by § 123.8's requirement that such processors maintain updated HACCP plans to reduce the risk of adulterated shellfish reaching the retail market. 21 C.F.R. § 123.8(a)(1); *see also Bissinger v. New Country Buffet*, 2014 WL 2568413, at *10 (Tenn. Ct. App. Jun. 6, 2014) (holding that the term "manufacturer" includes "processors" of raw shellfish). Therefore, the Court concludes that WSI is not a mere distributor or conduit within the meaning of Ala. Code § 6-5-521(b)(4). To the extent that WSI's activities as a processor or WSI's independent negligence contributed to Mr. Ruiz's injury, the innocent seller statute will not bar liability.

### 3. Mr. Ruiz's claims for violation of the AEMLD and for breach of implied warranty of merchantability

The plaintiffs contend that WSI violated the Alabama Extended Manufacturer Liability Doctrine (AEMLD) and breached the implied warranty of merchantability when WSI supplied contaminated oysters to Winitzell's. The AEMLD "was modelled after the product liability concepts of § 402A of the *Restatement (Second) of Torts* (1965), with one important difference: th[e Alabama Supreme] Court rejected the 'no-fault' concept of the Restatement." *Griggs v. Combe, Inc.*, 456 So. 2d 790, 791–92 (Ala. 1984). To establish a claim under the AEMLD, the plaintiff must show that "he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer." *Atkins v. American Motors Corp.*, 355 So. 2d 134, 141 (Ala. 1976).

Similarly, to prevail on a claim for breach of the implied warranty of merchantability, a plaintiff must show that the goods were unmerchantable or unfit for the ordinary purposes for which they ordinarily are used. *See* Ala. Code 1975, § 7-2-314. A warranty of merchantability for food products "is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Section 7–2–314(1). "When the entire purpose of the product is simply to be consumed . . . the fact that consumption is dangerous makes the product

unmerchantable." *Houston v. Bayer Healthcare Pharma., Inc.*, 16 F. Supp. 3d 1341, 1347 (N.D. Ala. 2014) (applying Alabama law).

"These two standards go hand-in-hand, at least as applied to food products, for it is apparent that a food product is defective or unreasonably dangerous if it is unmerchantable or unfit for human consumption." *Allen v. Delchamps, Inc.*, 624 So. 2d 1065, 1068 (Ala. 1993) (internal quotations omitted). Thus, the Court analyzes these two claims together.

The plaintiffs claim that high levels of *Virbrio vulnificus* bacteria made the oysters that Mr. Ruiz consumed dangerously defective. (Doc. 150, p. 43). WSI argues that, as a matter of law, the presence of *vibrio* bacteria does not make raw oysters unreasonably dangerous because *Vibrio vulnificus* occurs in nature and is present in most Gulf Coast raw oysters.[10]

Alabama applies the "reasonable consumer expectations" test to determine whether a product is unreasonably dangerous. *Ex Parte Morrison's Cafeteria of Montgomery, Inc.*, 431 So. 2d 975, 978 (Ala. 1983). The Alabama Supreme Court has held that the reasonable expectations test is "compatible with both the AEMLD and the implied warranty of merchantability, because the terms 'defect,' 'unreasonably dangerous,' and 'merchantable' all focus on the expectations of the

---

[10] Wintzell's echoes WSI's argument. The following analysis applies to both defendants.

ordinary consumer, possessed of the ordinary knowledge common to the community." *Cain v. Sheraton Perimeter Park South Hotel*, 592 So. 2d 218, 221 (Ala. 1991) (internal quotations omitted). "The pivotal issue in the reasonableness test is what a consumer is reasonably justified to expect to find in food bought for human consumption." *Huprich v. Bitto*, 667 So. 2d 685, 687–88 (Ala. 1995). The defendants emphasize that *vibrio* bacteria occur naturally in a large portion of oysters harvested on the Gulf Coast. (Doc. 142, pp. 8-10). While this is a relevant consideration, under the reasonable consumer expectations test, the simple fact that *vibrio* bacteria occur naturally does not establish that the risk which the bacteria pose when ingested is within the expectations of the reasonable consumer of oysters.

The parties have not cited and the Court has not located an opinion from an Alabama court addressing a case of *Vibrio vulnificus* poisoning. A review of decisions from other jurisdictions addressing cases of *vibrio* infection indicates a trend towards holding as a matter law that raw shellfish are neither defective nor unreasonably dangerous simply by virtue of containing *Vibrio vulnificus* bacteria. *See, e.g.*, *Simeon v. Doe*, 618 So. 2d 848, 851 (La. 1993). The line of reasoning common to these cases is that: (i) *Vibrio vulnificus* occurs naturally in shellfish, (ii) consumers cannot reasonably expect raw shellfish to be free of naturally-occurring

bacteria, and (iii) *vibrio* bacteria are not dangerous to the overwhelming majority of consumers. *See, e.g.*, *Bissinger*, 2014 WL 2568413, at *12.

Nearly every court presented with this question has determined that *vibrio* is not only a natural danger associated with oysters, but one that is a widely-known, and therefore expected by most consumers.[11] But these decisions establish only that a plaintiff may not survive summary judgment simply by proving that *vibrio* bacteria were present in the raw shellfish he consumed. When a plaintiff can prove that the shellfish in question were unreasonably dangerous not because of the levels of *vibrio* occurring in nature, but because of the defendant's handling of the shellfish caused dangerously high concentrations of *vibrio* bacteria in the shellfish that a plaintiff consumed, then a plaintiff may avoid summary judgment. In the latter scenario, courts have reasoned that they "cannot hold as a matter of law that such [reasonable consumer] expectation extends to elevated risk levels engendered by the alleged negligence of [the defendants]." *Horan v. Dilbet*, 2015 WL

---

[11] *Ayala v. Bartolome*, is the only decision the Court could locate in which a plaintiff survived summary judgment alleging only that the presence of vibrio bacteria made shellfish dangerous and unmerchantable. 940 S.W. 2d 727 (Ct. App. Tex. 1997). The following courts have held that the presence of *Vibrio* bacteria alone is legally insufficient to create an issue of fact as to whether the shellfish in question were unreasonably dangerous or defective: *Horan v. Dilbet, Inc.*, 2015 WL 5054856 (D.N.J. Aug. 26, 2015); *Clime v. Dewey Beach Enterprises, Inc.*, 831 F. Supp. 341 (D. Del. 1993); *Bissinger*, 2014 WL 2568413; *Bergeron v. Pacific Foods, Inc.*, 2011 WL 1017872 (Conn. February 14, 2011); *Simeon*, 618 So. 2d 848; *Woeste v. Washington Platform Saloon & Rest.*, 836 N.E. 2d 52 (Ohio Ct. App. 2005); *Edwards v. Hop Sin, Inc.*, 140 S.W. 3d 13, 16 (Ky. Ct. App. 2003).

5054856, at *11 (D.N.J. Aug. 26, 2015) (quoting *Clime v. Dewey Beach*, 831 F. Supp. 341, 350 (D. Del. 1993) (internal quotation marks omitted).

On the record in this case a dispute of fact exists as to whether reasonable consumers expect high concentrations of these bacteria in raw shellfish caused by alleged mishandling of the product. The Court, therefore, denies WSI's motion for summary judgment on the plaintiffs' claims for violation of the AEMLD and for breach of implied warranty of merchantability.[12]

### 4. Mr. Ruiz's negligence claims against WSI

The plaintiffs present three theories of negligence against WSI. They contend that WSI was altering the harvest dates recorded on the oyster tags, making the oysters appear to have a longer shelf life. (Doc. 150, pp. 9, 40). They argue that WSI has no evidence of its compliance with regulations governing maximum storage temperatures for raw shellfish and that WSI, in failing to keep temperature records, violated FDA standards. (Doc. 150, pp. 8-9). Finally, the plaintiffs submit that WSI was negligent in selecting Misho's Oysters as a supplier

---

[12] Although plaintiffs recite a claim for breach of implied warranty of fitness for a particular purpose in their response, they make no arguments addressing this cause of action. (Doc. 150, p. 6). If the plaintiffs maintain this claim, it is due to be dismissed for lack of evidence to support it. In the context of Wintzell's Oyster House, Mr. Ruiz's intended use of the raw oysters was their ordinary use. He has alleged no particular use for the oysters other than consumption, nor has he shown that any of the defendants were aware of a purpose which he might have had for the oysters other than consumption. Thus, plaintiffs fail to allege that Mr. Ruiz had a "particular purpose" within the meaning of § 7-2-315 of the Alabama Commercial Code. *See Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1100 (11th Cir. 1983).

because Misho's has a history of violations of oysters handling standards. (Doc. 150, p. 47).

With respect to their first theory, plaintiffs rely primarily on deposition testimony given by WSI manager, Jessica Webb. In this deposition, counsel for the plaintiffs confronted Ms. Webb with sales records and bills of lading that reflect inconsistent harvest dates for oysters sold to Wintzell's. (Doc. 150-6 pp. 98-100, 121-24, 132-33). The plaintiffs' experts opine that the apparent alteration of harvest dates affects this case because the *vibrio* levels in raw oysters are increasing each day from the time of harvest. (Doc. 150, pp. 30-31).

Although altering the harvest dates could allow oysters to become hazardous for consumption, the plaintiffs do not allege that this is what occurred. Both parties agree that raw oysters have a fourteen-day window after harvest in which the oysters can be consumed safely. (Doc. 137, p. 5; Doc 150, p. 48). The plaintiffs do not allege that the oysters WSI sold were outside of this window, and – so far as the Court can tell – there is no evidence suggesting that WSI's oysters were beyond the fourteen-day window on December 15, the night when Mr. Ruiz became ill. According to the plaintiffs' response to the motion for summary judgment, the records kept by WSI conflict as to whether the oysters which WSI eventually sold to Wintzell's were harvested on December 7 or December 8, 2012.

(Doc. 150, p. 48). Regardless, these oysters would have been within the 14-day window on December 15.

The plaintiffs argue that there were multiple inconsistencies in WSI's records concerning harvest dates in addition to the one singled out in their response. (Doc. 150, p. 30, fn. 23). Jessica Webb's deposition testimony reveals possible inconsistencies concerning oysters harvested on either December 2 or 3 of 2012. (Doc. 150-6, pp. 97-99, 132-33). Again, even if these oysters were sold to Mr. Ruiz, a fact which the plaintiffs do not specifically allege, they also would have been just inside their expiration window on December 15. The presence of inaccuracy in WSI's business records may constitute regulatory violations, but the plaintiffs must introduce evidence connecting these violations to Mr. Ruiz's injury. The contention that *vibrio* grows over time sheds little light on the link between WSI's behavior and Mr. Ruiz's injury when the oysters were within their conceded shelf-life. To allow such a theory to succeed would come too close to holding the defendants liable simply because *vibrio* was present at some level in the raw oysters. Thus, the issue of inaccurate or altered tags does not itself appear to be causally connected to Mr. Ruiz's injury.

Next the plaintiffs contend that WSI negligently mishandled the raw oysters by exposing them to air temperatures that allowed *vibrio* bacteria to multiply. (Doc. 150, p. 47). This theory is burdened by the fact that the plaintiffs have no

records of the temperatures at which WSI stored and shipped the oysters that were eventually sold to Wintzell's Huntsville. Contrary to the plaintiffs' suggestion, the absence of records does not by itself prove WSI's culpability, as the plaintiffs have the burden to come forward with evidence of temperature violations. The plaintiffs argue that their claims have been unfairly prejudiced by WSI's lack of recordkeeping, and they seek sanctions for the destruction of temperature records that they claim WSI was obligated to maintain. (Doc 151, pp. 4-5).

The power to impose sanctions to ensure the integrity of the discovery process is within the broad discretion of the district court. *See Flury v. Daimler Chrysler, Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). The Court applies federal law to assess the merits of a motion for sanctions, though the Eleventh Circuit has indicated that this application may be informed by state law. *Flury*, 427 F.3d at 944. Alabama law defines spoliation as "an attempt by a party to suppress or destroy material evidence favorable to the party's adversary." *Wal–Mart Stores, Inc. v. Goodman*, 789 So. 2d 166, 176 (Ala. 2000) (internal quotations omitted). While malice is not a requirement for the Court to impose sanctions, a showing that the defendant acted in bad faith is necessary. *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). Simple negligence resulting in the loss of evidence does not satisfy the requirement of bad faith. *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009). Thus, the absence of the records, no matter how important

to the plaintiffs' case, does not by itself create a presumption of bad faith. WSI is the non-movant for purposes of this motion, and the Court will therefore view the evidence in the light most favorable to the company.

The plaintiffs assert that WSI is culpable for destroying temperature records because, as a processor of raw shellfish, WSI has a statutory obligation to retain records relating to these products for two years. (Doc. 151, p. 2). WSI responds with its reading of the relevant statute which WSI contends requires retention of temperature records for only one year. The governing regulation reads in relevant part:

> (b) Record retention.
>
> (1) All records required by this part shall be retained at the processing facility or importer's place of business in the United States *for at least 1 year after the date they were prepared in the case of refrigerated products* and for at least 2 years after the date they were prepared in the case of frozen, preserved, or shelf-stable products.
>
> (2) Records that relate to the general adequacy of equipment or processes being used by a processor, including the results of scientific studies and evaluations, shall be retained at the processing facility or the importer's place of business in the United States *for at least 2 years after their applicability to the product being produced at the facility*.

21 C.F.R. § 123.9(b) (emphasis added). The question is whether cooler temperature records relate to refrigerated products governed by (b)(1) or whether they relate to the adequacy of a processor's processes as governed by (b)(2). While a colorable argument can be made that cooler temperatures relate to the

adequacy of processes used in preparing raw shellfish, a close reading of the regulation's language indicates that WSI has the better argument.

The quoted subsections appear to reference two different types of records. Subsection (b)(1) deals with records specific to food items which are then differentiated on the basis of whether the item to which the record relates is refrigerated or frozen. Subsection (b)(2) deals with records relating to broader, systemic concerns such as those reflected in a processor's HACCP plan. This broader concern is reflected by the types of records that are specifically mentioned in subsection (b)(2), namely "the results of scientific studies and evaluations. . . ." 21 C.F.R. § 123.9(b)(2). The plaintiffs seek records of cooler temperatures concerning a particular product on particular dates. Such records seem too narrow in scope to be grouped with records of scientific studies evaluating the general adequacy of processes used at a given facility. The Court therefore determines that WSI's cooler temperature records are governed by subsection (b)(1). As it is undisputed that raw oysters are refrigerated, not frozen, WSI is correct in its assertion that it was not statutorily required to retain temperature records for more than one year.

That WSI was not statutorily required to maintain the records for more than one year does not end the discussion if WSI had reason to know that this litigation was impending and was aware that the temperature records would be pertinent

evidence. WSI indicates that the plaintiffs never sent them a request for production. (Doc. 158, p. 8). The plaintiffs do not directly refute this statement, but argue that they gave WSI notice of their claims on September 4, 2014. (Doc. 151, p. 2). In her deposition, Ms. Webb indicates that she disposes of records required by WSI's HACCP plan after one year. (Doc. 151-1, p. 34). As cooler temperature records relate to a critical control point for bacteria growth, they would be covered by WSI's HACCP plan. Consequently WSI would have destroyed these records after a year. Given their limited shelf-life, oysters consumed on December 15 must have been processed in early December of 2012. By December of 2013, WSI, by company policy, could dispose of records relating to the refrigeration temperatures for oysters processed during the timeframe relevant to Mr. Ruiz's injury. Because WSI did not have notice of this case until September 2014, the Court cannot infer that WSI acted in bad faith in destroying the records. Therefore, the Court denies the plaintiffs' motion for sanctions.

Without temperature records, the plaintiffs have no other evidence supporting their theory that WSI mishandled the raw oysters sold to Wintzell's. Consequently, plaintiffs must rely on alternate theories of negligence.

Finally, the plaintiffs assert that WSI's selection of Misho's Oysters was a negligent act that contributed to Mr. Ruiz's *vibrio* infection. The Court treats this as an attempt to hold a principal liable for the acts of an independent contractor.

"Under Alabama law, a principal is not liable for the torts of an independent contractor." *Atkinson v. Jeff Lindsey Communities, Inc.*, 2016 WL 1312320, at *2 (M.D. Ala. Apr. 4, 2016) (citing *Fuller v. Tractor & Equip. Co., Inc.*, 545 So. 2d 757 (Ala. 1989)). An exception to this rule exists where the principal uses an independent contractor to accomplish a non-delegable duty. *See Gen. Fin. Corp v. Smith*, 505 So. 2d 1045, 1047 (Ala. 1987). A duty is non-delegable where "the obligations are expressly or impliedly imposed by statute, municipal ordinance, or by administrative rules or regulations, or by judicial decisions." *Bain v. Colbert Cty. Northwest Ala. Health Care Auth.*, 2017 WL 541912, at *13 (Ala. Feb. 10, 2017) (emphasis and internal quotations omitted). For companies like WSI, which sell a product to the public which they know will be consumed raw, Alabama law imposes a duty to exercise "that same degree of care which a reasonably prudent man, skilled in the art of selecting and preparing food for human consumption, would be expected to exercise in the selection and preparation of food for his own private table." *Hogue v. Logan's Roadhouse, Inc.*, 61 So. 3d 1077, 1081 (Ala. Ct. Civ. App. 2010). Therefore, WSI can be held liable for selecting Misho's if the plaintiffs' evidence indicates that Misho's breached the duty of care in a way that is causally related to Mr. Ruiz's injury.

To establish that Misho's was an unsafe harvester of oysters, the plaintiffs point to the report of Dr. Rodrick, who in turn relies on the testimony of Misho's

owner, Michael Ivic, for direct knowledge of the practices in question. Dr. Rodrick cites Misho's practice of keeping oysters aboard boats or on docks without refrigeration during November and December 2012 when the local temperatures reached over 70 degrees Fahrenheit. (Doc. 150-4, pp. 5-6). The Court notes that the period when Misho's allegedly mishandled its oysters includes the timeframe during which the oysters which Mr. Ruiz consumed were harvested. Dr. Rodrick states that Misho's had no "accurate records as to temperature controls for its live raw oysters." (Doc. 150-4, p. 5). In addition, Dr. Rodrick is prepared to testify that "[a]t least 7 deaths have been attributed to Misho's oysters," as evidence that WSI should have been on notice of its harvester's alleged deficiencies. (Doc. 150-4, p. 5). Roy Costa relies on the same testimony from Mr. Ivic to conclude that WSI's failure to verify the safety of its suppliers' practices greatly increased Mr. Ruiz's risk of *vibrio* infection. (Doc. 150-5, p. 4).

WSI responds that its decision to purchase oysters from Misho's was in compliance with the only regulation governing the obligations of shellfish processors to ensure a safe supply chain: 21 C.F.R. § 123.28. (Doc. 156, p. 7). This regulation requires that processors purchase only from dealers who have been licensed by the State approval processes and who have not been fishing in waters designated as closed by the Federal Government. *See* 21 C.F.R. § 123.28(b), (c).

Plaintiffs do not allege that Misho's lacked this license, nor do they allege that Misho's was fishing in closed waters.

Despite WSI's apparent compliance with this regulation, issues of fact concerning its use of Misho's as an oyster supplier remain. "The general rule is that '[c]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.'" *Stewart v. Hewlett Packard Co.*, 2012 WL 6043642, at *5 (N.D. Ala. Nov. 29, 2012) (quoting Rest. 2d Torts § 288C (1965)); *see also Dunn v. Wixom Brothers*, 493 So. 2d 1356, 1359 (Ala. 1986) ("customary practices or standards do not furnish a conclusive test of negligence"). The prevalence of *vibrio* in Gulf Coast oysters and the bacteria's devastating health effects on certain segments of the population counsel that those in the business of bringing raw oysters to the public take great care in doing so. Consequently, WSI's compliance with applicable regulations, standing alone, does not negate an issue of fact. The plaintiffs have alleged facts which, taken as true for purposes of summary judgment, raise issues about whether WSI was or should have been on notice of practices by Misho's that appear to fall below the industry's normal standards of care. Thus, the Court denies WSI's motion for summary judgment on the plaintiffs' claim for negligent selection of a supplier.

**B. Price Foods, Inc.'s Motion for Summary Judgment**

The plaintiffs allege that Price Foods failed to adequately train employees at Wintzell's Huntsville on the proper handling of raw oysters and that "this failure to properly train and to supervise constitutes negligence." (Doc. 150, p. 15). Price Foods is entitled to summary judgment on Mr. Ruiz's negligence claim because the record demonstrates that Price Foods is a legally distinct entity that does not own, operate, or control the Wintzell's Huntsville restaurant where Mr. Ruiz dined.

Price Foods owns and operates a Catfish Cabin restaurant and six Huddle House Restaurants within Alabama. (Doc. 90, p. 2). Price Foods does not own Wintzell's Huntsville. The plaintiffs attempt to hold Price Foods liable because Dana Price, who owns 50 percent of Wintzell's Huntsville, also owns 100 percent of Price Foods. (Doc. 90, pp. 1-2). The plaintiffs also point to the fact that Alan Renfroe, who is employed by Price Foods, also is employed by Mr. Price in a managerial capacity at Wintzell's Huntsville. (Doc. 163, pp. 19-21). The plaintiffs note that only Price Foods appears to have paid Mr. Renfroe for his work. (Doc. 150-11, pp. 31-32).

The overlap in management and ownership does not make Price Foods, a legally separate entity, liable for the negligent acts or omissions allegedly committed by Wintzell's Huntsville. "A corporation can act only through its servants, agents, or employees; but the acts of those servants, agents, or employees

are not the acts of the corporation unless the servants, agents, or employees are acting for the corporation . . . ." *U.S. Fidelity & Guar. Co. v. Russo Corp.*, 628 So. 2d 486, 488 (Ala. 1993). The acts of an agent are attributable to the principal where the principal reserves a right to control the agent's performance and the agent acts within the scope of their agency or employment relationship. *See Hulbert v. State Farm Mut. Auto Ins. Co.*, 723 So. 2d 22, 24 (Ala. 1998); *U.S. Fidelity & Guar. Co.*, 628 So. 2d at 488. Agents act within the scope of their employment or agency relationship when they perform acts for which they were hired or which they undertake for the principal's benefit. *Hulbert*, 723 So. 2d at 24. "[T]he party asserting [an agency relationship] has the burden of adducing substantial evidence to prove its existence." *Kennedy v. Western Sizzlin Corp.*, 857 So. 2d 71, 77 (Ala. 2003)

Although the plaintiffs' evidence supports the conclusion that Mr. Renfroe is the agent of multiple principals, the plaintiffs have not demonstrated why the alleged negligence of Mr. Renfroe should be attributed to Price Foods, rather than to Wintzell's Huntsville alone. As the managing member of Wintzell's Huntsville and the sole owner of Price Foods, Dana Price likely was the person exercising control over Mr. Renfroe, but it does not follow that Mr. Price was exercising that control on behalf of Price Foods. The plaintiffs have not provided evidence that Mr. Renfroe's management activities at Wintzell's Oyster House were within the

scope of his employment relationship with Price Foods.  The plaintiffs' attempt to extend liability to Price Foods rests largely on the fact that Mr. Renfroe received his salary from Price Foods, not Wintzell's.  Standing alone, the paycheck is not substantial evidence of an agency relationship connecting Mr. Renfroe's work at Wintzell's to his relationship with Price Foods.  Consequently the Court grants summary judgment in favor of Price Foods on all of plaintiffs' claims against the company.

## C. Wintzell's Motion for Summary Judgment

### 1.  Wintzell's innocent seller defense

The Wintzell's defendants also claim that Alabama's innocent seller statute entitles them to summary judgment because they are no more than retailers of a product prepared by parties further up the supply chain.  (Doc. 142, pp. 5-7). Wintzell's Huntsville performs some tasks under the definition of the term "process" including handling, storing, and shucking raw oysters.  (Doc. 163, p. 35).[13]  The plaintiffs, however, do not appear to argue that Wintzell's Huntsville is a manufacturer or processor of shellfish.  Instead, the plaintiffs argue that Wintzell's committed independent acts of negligence precluding them from the statute's protection.  (Doc. 150, p. 44).

---

[13] *See* Footnote 9, *supra.*

The innocent seller statute "is not intended to protect distributors from independent acts unrelated to the product design or manufacture, such as independent acts of negligence, wantonness, warranty violations, or fraud." Ala. Code 1975 § 6-5-521(b)(4). As discussed in detail below, the plaintiffs allege that the Wintzell's defendants committed acts of negligence unrelated to the product's design or manufacture and that these were causes of Mr. Ruiz's injury. Thus, to the extent the plaintiffs' evidence creates an issue of fact regarding Wintzell's alleged negligence, the innocent seller statute will not bar the plaintiffs' claims.[14]

## 2. Mr. Ruiz's negligence claims against Wintzell's Huntsville

The plaintiffs allege that several negligent acts and omissions by Wintzell's Huntsville caused *vibrio* bacteria in its oysters to multiply to unsafe levels, thereby causing Mr. Ruiz's infection. (Doc. 150, p. 12). They point to Wintzell's manner of storing and serving raw oysters as factors causally related to the gowth of *vibrio* bacteria. (Doc. 150, p. 12-13). Plaintiffs also contend that Wintzell's Huntsville choice of WSI and Misho's Oysters as suppliers of raw oysters was negligent.[15] This argument is addressed below alongside the identical claim made against Wintzell's Franchise Co.

_____

[14] This analysis applies to both Wintzell's Huntsville, LLC and Wintzell's Franchise Company.

[15] In addition to their negligence claims against Wintzell's Huntsville, the plaintiffs assert AEMLD and breach of implied warranty of merchantability claims against this defendant. The Court addressed the latter claims as they pertain to WSI at pp. 21-25 above. The reasoning is the same with respect to Wintzell's.

Under Alabama law, "to establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Hilyer v. Fortier*, 2017 WL 65346, at *7 (Ala. Jan. 6, 2017). The particular duty that Alabama tort law imposes upon restaurant owners is as follows:

> The law requires that, in the selection of the food for his restaurant and in cooking it for his customers, he shall exercise that same degree of care which a reasonably prudent man, skilled in the art of selecting and preparing food for human consumption, would be expected to exercise in the selection and preparation of food for his own private table.

*Hogue*, 61 So. 3d at 1081. The mere fact that a customer becomes ill after dining at a restaurant does not raise a presumption of negligence. Instead, the plaintiff must present evidence "from which a jury could at least infer that the restaurant failed to act with due care in the preparation of the plaintiff's food." *Hogue*, 61 So. 3d at 1082.

The plaintiffs' negligence claims rest on their theory that *vibrio*, while naturally present in most oysters, becomes unsafe to consumers at higher concentrations. (Doc. 150, p. 3). Thus, acts or omissions by a restaurant or supplier that allow *vibrio* to multiply increase the risk of serious infection and are a breach of the duty owed to the customer. (Doc. 150, p. 4). As evidence for this theory, plaintiffs point to the report of Dr. Rodrick in which he states that "*vibrio*

below certain levels (estimated to be 60 organisms per gram) do not harm humans who ingest raw, live oysters. *Vibrio* at higher levels poses a health risk to all humans." (Doc. 150-4, p. 4). According to Dr. Rodrick, individuals with healthy livers and immune systems generally will respond with vomiting or diarrhea, but for those who have compromised livers or immune systems, *vibrio* poisoning is potentially fatal. (Doc. 150-4, p. 4).

Consistent with Dr. Rodrick's opinion, the plaintiffs point to affidavits by two of Mr. Ruiz's co-workers who dined with him at Wintzell's on December 15 and consumed the same raw oysters. Their testimony is that they began experiencing nausea, vomiting, and diarrhea the same evening that they ate oysters with Mr. Ruiz, and that these symptoms persisted for several days. (Doc. 150-3, p. 1, 3). Plaintiffs also note that Mr. Ruiz had consumed Wintzell's raw oysters on several occasions prior to December 2012 without any ill effect. (*See* Doc. 150-2). Plaintiffs maintain that Mr. Ruiz's past ability to consume oysters without issue despite his undiagnosed liver problem indicates that there was something seriously wrong with the oysters that Wintzell's served on December 15. (Doc. 150, pp. 7, 20).

The plaintiffs identify several acts or omissions by Wintzell's and its employees that they claim contributed to the multiplication of *vibrio* in the oysters served to Mr. Ruiz. They cite to Wintzell's co-mingling of shellstock in violation

of health regulations (Doc. 150, p. 9); they cite the fact that oysters were served to Mr. Ruiz on a plate instead of resting directly on top of drained ice as required by state law (Doc. 150, p. 12); they cite to recorded refrigeration temperatures above the prescribed temperature threshold (Doc. 150, p. 13); and they cite to Wintzell's failure to keep oyster harvest tags in chronological order (Doc. 150, p. 13).

Plaintiffs' expert, Roy Costa, offers his opinion that, at least with respect to the manner in which Wintzell's served and stored oysters, failure to abide by the requirements of state and federal regulations likely allowed *vibrio* bacteria to multiply to unsafe levels in the raw oysters that Wintzell's served. (Doc. 150-5, p. 4). Mr. Costa further opines that a higher concentration of *vibrio* bacteria in an oyster increases the likelihood of serious infection like the one suffered by Mr. Ruiz. (Doc. 150-5, pp. 2, 4). Mr. Costa relies on the affidavits of Mr. Ruiz's co-workers, Abner Deleon and Bayron Barrios, for information on Wintzell's method of serving oysters, and on the health inspection records to establish issues with Wintzell's refrigerated storage. (Doc. 150-5, p. 5; Doc. 150-3, pp. 2, 3).

Two courts have addressed theories of recovery virtually identical to the one plaintiffs offer here, in cases where the plaintiffs suffered severe *vibrio* infections after consuming raw shellfish. In *Clime v. Dewey Beach Enterprises*, the source of the *vibrio* bacteria was raw clams that the plaintiff consumed at the defendant's buffet. 831 F. Supp. at 342. The plaintiff's injury was exacerbated by the fact that

he had cirrhosis of the liver, making him more vulnerable to *vibrio* infection. *Clime*, 831 F. Supp. at 342. After the court dismissed claims premised on the theory that the presence of *vibrio* alone permitted recovery, the Court addressed the plaintiff's contention that the defendants had negligently contributed to *vibrio* multiplication in their raw clams. The plaintiff offered his personal observation and that of another patron that the defendant left raw clams in an unrefrigerated area as the clams were shucked and placed on the buffet. *Clime*, 831 F. Supp. at 350. Presented with this evidence, the District Court for the District of Delaware determined that summary judgment for the defendant was inappropriate. The district court noted that although "a consumer should reasonably expect a raw clam to pose some health risk, [the court] cannot hold as a matter of law that such expectation extends to elevated risk levels engendered by the alleged negligence of the [defendant restaurant]." *Clime*, 831 F. Supp. at 350.

The defendants in *Clime* complained, as do the defendants here, that "there [wa]s nothing in the evidentiary record to support the plaintiff's assertion that storage above approximately forty-five degrees [Fahrenheit] increases potential health risks to humans upon ingestion." *Clime*, 831 F. Supp. at 344; (Doc. 139, pp. 2-3, 8). But here, as in *Clime*, the defendant is incorrect for two reasons. The plaintiffs' experts have given testimony that industry practice is to keep raw shellfish refrigerated at or below 41 degrees Fahrenheit. (Doc. 150-5, pp. 2, 4;

Doc. 139-1, p. 9).  Equally relevant is the fact that the FDA and the State of Alabama require raw shellfish to be refrigerated at or below 45 degrees Fahrenheit. *See* Ala. Admin. Code r. 420-3-18-.03(7).[16]

The plaintiffs submit records of health inspections at Wintzell's Huntsville which include citations for refrigerator temperatures as high as 47 degrees Fahrenheit, as well citations for inconspicuous or missing thermometers.  (Doc. 150-17, pp. 2, 4, 5).  One such inspection where a temperature violation was recorded occurred on December 6, 2012, just days prior to Mr. Ruiz's visit.  While the refrigerator temperature violations are not all specific to oysters, that fact does not wholly negate the relevance of this evidence.  *See Bissinger*, 2014 WL 2568413, at *16 ("We are not persuaded that proof should be limited to raw oysters. The restaurant's handling of other food products, especially those with requirements similar to oysters, is relevant to the issues.").  Thus, the plaintiffs have submitted evidence establishing a standard of care, and evidence indicating that Wintzell's breached that standard.  Although there is some disagreement between the plaintiffs' experts and the defendants' expert, Dr. Oliver, over the

---

[16] Alabama state regulations define refrigeration as storage temperatures at or below 45 degrees Fahrenheit.  Ala. Admin. Code r. 420-3-18-.03(7).  The Court also notes that, according to the National Shellfish Sanitation Program, the "FDA recommends that potentially hazardous food be held at 5° C (41° F) or below, and if large volumes are involved in processing, methods be employed to rapidly cool the product to an internal temperature of 5° C (41° F) within four (4) hours." NATIONAL SHELLFISH SANITATION PROGRAM, GUIDE FOR THE CONTROL OF MOLLUSCAN SHELLFISH 174 (2011).

temperatures at which *vibrio* cease to multiply, resolution of that disagreement is an issue of fact for the jury. (*See* Doc. 142-3, p. 7; Doc. 150-4, p. 6; Doc. 150-5, pp. 2, 4).

In *Horan v. Dilbet, Inc.*, the district court for the District of New Jersey dealt with another instance of *vibrio* infection from raw clams. 2015 WL 5054856. Like Mr. Ruiz, the plaintiff had an undiagnosed condition rendering her more susceptible to *vibrio* infection. 2015 WL 5054856, at *1–2. The plaintiff in *Horan* presented evidence that the defendant restaurant had a record of health code violations including refrigerator temperatures in excess of those allowed by state law and unsanitary conditions on surfaces where employees prepared raw shellfish. 2015 WL 5054856, at *2, 5. She claimed that these violations caused *vibrio* to multiply to dangerous levels in the raw clams which she ingested, and that the high concentration of bacteria caused her infection. 2015 WL 5054856, at *5.

Faced with an identical theory and similar evidentiary showing to those in *Clime*, the district court reached the same conclusion, holding that the alleged, increased risk attributable to defendant's negligence created a dispute of material fact notwithstanding the plaintiff's concession that *vibrio* can occur naturally at toxic levels. 2015 WL 5054856, at *11.

The plaintiffs here present both eyewitness evidence of Wintzell's negligence on December 15, 2012 and documentary evidence indicating possible negligence on other occasions. In addition, the plaintiffs presented evidence that other consumers were adversely affected by the same oysters on the same occasion. In light of the close parallels with the evidence deemed sufficient to survive summary judgment in *Clime* and *Horan*, the Court finds that the plaintiffs' evidence creates issues of fact that preclude summary judgment.

Defendants contend that it was not any growth in *vibrio* but Mr. Ruiz's then undiagnosed Hepatitis C which was the cause in fact of his injury, since most healthy persons are not affected by consuming *vibrio* in raw oysters. While it is undeniable that Mr. Ruiz's condition made him more vulnerable to *vibrio* infection, it does not follow that this was the sole cause of his injury. There is evidence in the record suggesting that *vibrio* can negatively affect otherwise healthy people. (Doc. 150-4, p. 3). Indeed there is evidence suggesting that *vibrio* adversely affected otherwise healthy people in this very case. (Doc. 150-3, pp. 1, 3). Mr. Ruiz's Hepatitis C likely is why he suffered such severe consequences from ingesting *vibrio*, but it is also true that *vibrio* bacteria was a but-for cause of Mr. Ruiz's injuries. *See Dempsey v. Phelps*, 700 So. 2d 1340, 1348 (Ala. 1997) ("[A] defendant is responsible for the probable consequences of his actions, regardless of the preexisting condition of the plaintiff."). And the plaintiffs'

evidence creates a genuine issue of fact as to whether the defendants caused *vibrio* to multiply to toxic levels in the oysters they were selling to the public.

The Court notes that "[i]t is certainly 'reasonably foreseeable' that a person who suffers from an undiagnosed condition that unbeknownst to h[im] renders h[im] highly-susceptible to a *Vibrio* infection would nonetheless consume raw shellfish." *Horan*, 2015 WL 5054856 at *11. Testimony from the defendants' own expert reveals what a broad swath of the public can face serious health consequences as a result of *vibrio* infection. (*See* Doc. 142-3, pp. 4-5).[17] Therefore, Mr. Ruiz's underlying condition does not preclude an issue of material fact on the question of whether Wintzell's Huntsville's negligence was a cause of Mr. Ruiz's injury.

Generally, the question of proximate cause is a question of fact for a jury. *Cain*, 592 So. 2d at 222. The plaintiffs here have created issues of fact on whether acts or omissions by Wintzell's Huntsville caused *vibrio* to multiply in the oysters served to Mr. Ruiz and whether the increase in *vibrio* is what caused Mr. Ruiz's injury. Therefore, the Court denies the Wintzell's Huntsville's motion for summary judgment on the negligence claims.

---

[17] In Dr. Oliver's sworn statement, he notes that those vulnerable to severe *Vibrio vulnificus* infections include persons with liver disease, persons with hemochromatosis, persons with diabetes, persons with stomach problems, persons with cancer, and persons with immune disorders. Dr. Oliver opines that "[m]any of the above persons in these risk groups may have no symptoms and may not know they are in a risk group." (Doc. 142-3, p. 5).

### 3. Mr. Ruiz's negligence claims against Wintzell's Franchise Company

The plaintiffs argue that Wintzell's Franchise is liable for a failure to implement adequate procedures for storing raw shellfish and for properly cataloguing harvest tags. (Doc. 150, pp. 13-14). The plaintiffs also contend that Wintzell's Franchise was involved in the selection of oyster suppliers for its franchisees. The plaintiffs assert that the selection of WSI and Misho's Oysters by both Wintzell's entities is another instance of actionable negligence. (Doc. 150, pp. 10, 14, 16).

The first of these theories is a form of vicarious liability. *See, e.g.*, *Dolgencorp, LLC v. Spence*, 2016 WL 5817690 (Ala. Sept. 30, 2016). To hold a third party vicariously liable for the acts of another, a plaintiff must show that an agency relationship exists between the tortfeasor and the third party. *See Ware v. Timmons*, 954 So. 2d 545, 549 (Ala. 2006). The relationship between franchisor and franchisee is not necessarily an agency relationship. Where a plaintiff alleges that a franchisor is liable for the negligence of the franchisee, the plaintiff must show not only the existence of a franchise agreement, but also the fact that the franchisor "reserved a right of control over the manner of the alleged agent's performance." *Wood v. Shell Oil,* 495 So. 2d 1034, 1036 (Ala.1986). That the franchisor reserves a "right to supervise the alleged agent to determine if that

person conforms to the performance required by a contract . . . does not, itself, establish control." *Kennedy*, 857 So. 2d at 77 (internal quotations omitted).

Although the plaintiffs have offered the franchise agreement as an exhibit, they make no argument as to why Wintzell's Huntsville was the agent of Wintzell's Franchise. A review of the agreement indicates that Wintzell's Franchise made introductory training mandatory for franchise managers. (Doc. 150-24, p. 18). It also indicates that Wintzell's Franchise may make further training available to employees of the franchisee at a fee. (Doc. 150-24, pp. 16, 19). The agreement reserves to Wintzell's Franchise the right to review whether the franchisee is in compliance with the terms of the franchise agreement, but the agreement has no language suggesting that Wintzell's Franchise exercises day-to-day control over the operations at any of their franchise locations.

Given that Wintzell's Franchise sells the right to operate oyster houses, the alleged lack of policies or procedures governing how the franchisees are to handle the raw form of this product is somewhat surprising. What is missing, however, is the necessary link of control that would allow a jury to attribute the actions of Wintzell's Huntsville to Wintzell's Franchise. The testimony of Dana Price indicates that the manager at Wintzell's Huntsville had the responsibility of training the restaurant's employees. (Doc. 163, pp. 31-32). Wintzell's Franchise was not in control of the operations at Wintzell's Huntsville, and thus Wintzell's

Franchise owed no duty to Mr. Ruiz to ensure that employees at the Huntsville location were fully trained on handling raw oysters.

The plaintiffs' second claim alleging negligent selection of oyster suppliers implicates both Wintzell's Huntsville and Wintzell's Franchise. As with plaintiffs' identical claim against WSI, the Court treats this as an effort to impose liability on the principal for acts of an independent contractor. *See* pp. 30-31 above. Therefore, the Wintzell's defendants can be held liable only if their independent contractor breached a non-delegable duty in a manner causally connected to Mr. Ruiz's injury. *See Atkinson*, 2016 WL 1312320, at *2.

The Wintzell's defendants argue that there is no evidence that they owe a duty to verify the practices of their food suppliers, but the Court has already noted that under Alabama law, the commercial seller of foods has a non-delegable duty to exercise the skill and care of a reasonably prudent person in selecting foods served to the public. *See Hogue*, 61 So. 3d at 1081. This duty plainly applies to Wintzell's Huntsville, and it applies to Wintzell's Franchise to the extent Wintzell's Franchise participates in the decision of which food suppliers its franchisee uses.

The franchise agreement contains language indicating that Wintzell's Franchise exercises control over the franchisee's selection of food vendors.

Wintzell's Franchise provides a set of standards to which food vendors must conform, it provides a list of approved food vendors, and it requires that franchisees request permission before purchasing items like food products from a non-approved vendor. (Doc. 150-24, pp. 12-13). The agreement indicates that Wintzell's Franchise has a proprietary set of criteria for vetting its vendors. (Doc. 150-24, p. 13). The deposition testimony of Mr. Price indicates that Wintzell's Huntsville purchased from WSI, through Sysco, because both companies were approved by Wintzell's Franchise. (Doc. 163, pp. 46-48).

Managers at both Wintzell's Huntsville and Wintzell's Franchise have testified that WSI was selected as an oyster supplier because of the company's ability to meet Wintzell's regular demand. (Doc. 150-5, p. 3; Doc. 150-15, p. 40). The plaintiffs cite this testimony as evidence of a lack of vetting by the Wintzell's defendants in their selection process. (Doc. 150, p. 10). But Wintzell's stated basis for selecting a supplier does not necessarily mean that they sacrificed quality and safety for profitability. More than statements of basic market considerations are necessary to create an inference of negligence.

Apart from the foregoing allegations, the plaintiffs rely upon the same facts that they use to sustain their negligent-selection claim against WSI. Dr. Rodrick indicates that WSI has had two deaths attributed to its oysters while seven deaths had been attributed to their harvester, Misho's Oysters. (Doc. 150-4, p. 5). The

report does not indicate over what period of time these incidents were recorded, nor does any party present evidence informing the Court of whether this number of fatalities is in any way unusual or disproportionately large given the size of the suppliers' businesses. According to WSI, the company has been sued only once over a death related to its oysters. (Doc. 158, p. 8). There is no evidence in the record to counter Dr. Rodrick's report of seven deaths attributed to Misho's. Without further context for the evidence presented, the Court cannot determine whether the evidence of oyster-related deaths is probative of negligence.

The evidence indicating that a supplier mishandled oysters by exposing them to high temperatures relates exclusively to Misho's. (*See* Doc. 150-4, pp. 5-6; Doc. 150-5, p. 3). The Court has already held that this evidence creates an issue of fact as to whether WSI was negligent in selecting Misho's. *See* p. 31 above. That the evidence is adequate with respect to WSI does not mean that it is necessarily adequate to sustain the same claim against the Wintzell's defendants. Between the Wintzell's defendants and Misho's are two other entities: WSI and Sysco. Given WSI's proximity in the supply chain to Misho's, it is fair to conclude that WSI chooses to do business with Misho's and that verification of Misho's practices is plausibly a part of WSI's duty to consumers of oysters.

The same is not necessarily true for Wintzell's. The franchise agreement expressly mentions Sysco as an approved food supplier to Wintzell's. (Doc. 150-

24, p. 12). The plaintiffs have not presented evidence that Sysco mishandled the oysters. Plaintiffs' response acknowledges that Sysco kept records verifying the temperatures at which they shipped and sold oysters to Wintzell's. (Doc. 150, p. 9, note 11, and p. 47, note 30). Plaintiffs provide no evidence demonstrating that either Wintzell's entity was involved in selecting Misho's as a harvester. Finally, despite the evidence of mishandling by Misho's, the plaintiffs present no evidence that Wintzell's was or should have been aware of these issues. Although a retailer must exercise care is selecting the foods they offer to the public, the plaintiffs have not presented substantial evidence that either Wintzell's defendant breached that duty in its selection of food suppliers. Accordingly, the Court grants summary judgment in favor of Wintzell's Franchise on the plaintiffs' claims.

### 4. Mr. Ruiz's claim for inadequate warning

The plaintiffs allege that both Wintzell's Huntsville and Wintzell's Franchise Company failed to adequately warn Mr. Ruiz of the dangers associated with consuming raw oysters. (Doc. 118, p. 6). Mr. Ruiz acknowledges that Wintzell's menu includes a warning regarding the dangers of raw shellfish consumption and that he read that warning. (Doc. 142-1, p. 4). But the plaintiffs contend that Wintzell's warning deviates materially from the warning recommended by WSI, which they concede to be adequate. (Doc. 150, pp. 11-12).

Alabama does not mandate a particular warning addressing the risks of consuming raw shellfish. (Doc. 142-3, p. 8). Generally, a duty to warn arises where the product is dangerous when put to its intended use. *Gurley v. Am. Honda Motor Co., Inc.,* 505 So. 2d 358, 361 (Ala. 1987). Other states addressing the issue of *Vibrio vulnificus* in raw oysters have concluded that some warning is necessary for consumer safety. *See, e.g.*, *Simeon*, 618 So. 2d at 852 (La. 1993) ("it is clear that there was a danger inherent in the normal use of the product not within the knowledge of an ordinary user . . . Given the magnitude of the possible harm, we believe a warning is particularly necessary."). Although some warning may be necessary, there is no requirement that it be the best possible warning; it "'need only be one that is reasonable under the circumstances. . . .'" *Borum v. Werner Co.*, 2012 WL 2047678, at *15 (N.D. Ala. Jun. 6, 2012) (quoting *Gurley*, 505 So. 2d at 361).

To create an issue of fact regarding the warning's adequacy, the plaintiffs rely on the report of Dr. Rodrick. Dr. Rodrick opines that the language of Wintzell's warning was too general, that it was in small, obscure type, and that it failed to alert persons at risk to the specific danger of *vibrio* in raw oysters. Dr. Rodrick asserts that a sufficient warning would likely have prevented Mr. Ruiz from eating raw oysters. (Doc. 150-4, p. 11).

The Court is not convinced that the differences between Wintzell's warning and the warning suggested by WSI render the former legally inadequate. Wintzell's warning reads as follows:

> There may be a risk associated with consuming undercooked meat and raw shellfish as may be the case other raw products. If you suffer from chronic illness of the liver, stomach or blood, or have other immune disorders, you should eat these products fully cooked.

(Doc. 150-16, p. 3). The warning recommended by WSI reads:

> There is risk associated with consuming raw oysters. If you have chronic illness of the liver, stomach or blood or have immune disorders, you are at greater risk of serious illness from raw oysters, and should eat oysters fully cooked. If unsure of your risk, consult a physician.

(Doc. 150-4, p. 10).

There is, however, a more obvious reason for granting summary judgment to Wintzell's on this issue: the plaintiffs have not adduced evidence to support a causal connection between Wintzell's warning and Mr. Ruiz's injury. "To prevail on a failure-to-warn claim under Alabama law, a plaintiff must demonstrate a causal link between the allegedly inadequate warning and the injury." *Barnhill v. Teva Pharma. USA, Inc.*, 819 F. Supp. 2d 1254, 1261 (S.D. Ala. 2011). Although Dr. Rodrick states a conclusion on the issue of causation, his conclusion does not apply to the particulars of this case. During Mr. Ruiz's deposition, opposing

counsel posed questions to Mr. Ruiz regarding Wintzell's warning, and Mr. Ruiz responded as follows:

> Q. [] So if you had known you had a liver issue, you would have never eaten raw oysters?
>
> A. If I knew they were going to be bad for me, there's no way I would touched them. It did not apply to me the print on the restaurant or the menu. I mean, I've seen them there, but it did not apply to me. . . .
>
> . . .
>
> Q. . . . there's a statement at the bottom of that menu about don't consume raw oysters or other raw and undercooked food if you have some type of liver issue?
>
> A. Yeah. Chronic illness or liver, stomach, yes. But, like I tell you, this did not apply me. I was healthy as far as I was concerned.

(Doc. 142-1, p. 4). This exchange indicates that no warning, however detailed or specific, would have prevented Mr. Ruiz from eating oysters because he was not aware of his latent vulnerability to bacteria commonly found in raw oysters. The plaintiffs reiterate this core set of facts – that Mr. Ruiz did not heed the warning because he was unaware of his liver condition – in their response to the defendants' motions for summary judgment. (Doc. 150, p. 18). Consequently, the Court finds that the plaintiffs have not introduced enough evidence to support an inference that an adequate warning would have prevented Mr. Ruiz's injuries. The Court grants Wintzell's motion for summary judgment on plaintiffs claim for failure to warn.

### D. Mrs. Ruiz's claim for loss of consortium

"A loss-of-consortium claim is derivative of the claims of the injured spouse." *See Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008). Therefore, Mrs. Ruiz's loss-of-consortium claim fails only if all of Mr. Ruiz's claims fail. The Court has determined that several of Mr. Ruiz's claims survive summary judgment. Therefore, Mrs. Ruiz's claim for loss of consortium survives summary judgment as well.

## IV. CONCLUSION

Consistent with the preceding discussion, the Court grants summary judgment in favor of Price Foods and Wintzell's Franchise Company on all of the plaintiffs' claims. The Court grants summary judgment in favor of Wintzell's Huntsville, LLC on the plaintiffs' claim for failure to warn. The Court denies summary judgment to Wintzell's Huntsville, LLC and to WSI on the plaintiffs' claims for violation of the AEMLD, breach of implied warranty of merchantability, negligence, and loss of consortium.

**DONE** and **ORDERED** this September 28, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE